## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CONTINENTAL RESOURCES, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. CIV-04-1681-F |
| ) | |
| PXP GULF COAST, INC. and ) | |
| PXP LOUISIANA, LLC, ) | |
| ) | |
| Defendants. ) | |

## <u>OUTLINE OF ORDER</u>

I.  Background.

      A.  Parties.

      B.  Claims.

II.  Standards.

III.  Introductory Fact-Findings and Conclusions of Law.

IV.  Plaintiff's Motion for Partial Summary Judgment.

      A.  The PXP Defendants' Liability for any Pre-merger Misconduct by 3TEC.

      B.  The PXP Defendants' Alleged Breaches of the Parties' Written Agreements.

            1.  CRI's Allegation that there was a Breach of the Parties' Written Agreements Because Defendants Failed to Offer CRI the Opportunity to Acquire CRI's Working Interest in Certain Leases.

            2.  CRI's Alleged Entitlement Under the Parties Written Agreements to a 10% Working Interest in the Aquarius Well.

3.  The PXP Defendants' Alleged Breach of the Joint Exploration Agreement By Refusing to Pay CRI its Share of Natural Gas, Oil and Condensate Produced from the Aquarius Well.

4.  The PXP Defendants' Alleged Breach of the Joint Exploration Agreement and Joint Operating Agreements by Refusing CRI Seismic Information and Other of CRI's Alleged Rights.

C.   CRI's Request for an Adjudication that the PXP Defendants Owed Fiduciary Duties and that the Defendants Breached those Duties.

1.  Joint Venture and Partnership.

Statutory factors:

a. Receipt or Right to Receive a Share of Profits of the Business.

b.  Expression of Intent to be Partners.

c.  Participation or Right to Participate in Control of the Business.

d.  Sharing or Agreeing to Share Losses of the Business or Liability for Claims by Third Parties Against the Business.

e.  Contributing or Agreeing to Contribute Money or Property to the Business.

2.  Agency.

3.  Defendants' Argument that the Texas Independent Injury Rule Bars Any Liability on the Defendants' Part for Any of the Torts Alleged by CRI.

D.  CRI's Request for an Adjudication that the PXP Defendants Had a Duty Under Tort Law to Disclose Material Facts and that Defendants Breached that

Duty by Failing to Disclose and by Misrepresenting Material Facts Surrounding Defendants' Activities in the Breton Sound Area.

V.  The PXP Defendants' Motion for Summary Judgment.

    A.  Defendants' Request for an Adjudication that CRI has the Right to Acquire Only an Undivided 5% of 8/8ths Working Interest in SL Nos. 17767, 17963, 17965 and 18340.

    B.  Defendants' Request for an Adjudication in Their Favor on CRI's Breach of Fiduciary Duty Claim.

    C.  Defendants Request for an Adjudication in Their Favor on CRI's Breach of the Duty of Good Faith and Fair Dealing Claim.

    D.  The Independent Injury Rule as Applied to CRI's Tort Claims Including its Conversion Claim.

    E.  Duty to Disclose Claim.

VI.  Rulings.

    A.  Plaintiff's Motion for Partial Summary Judgment.

    B.  Defendants' Motion for Partial Summary Judgment.

    C.  Claims and Issues Remaining for Trial.

## ORDER

Plaintiff's motion for partial summary judgment (doc. no. 79) and defendants' motion for partial summary judgment (doc. no. 77), both filed July 7, 2006, are before the court and ready for determination.

### I.  Background.

This action arises from plaintiff's and defendants' dealings concerning oil and gas interests in the Breton Sound Area of Plaquemines Parish, Louisiana.

### A.  Parties.

Plaintiff is Continental Resources, Inc., referred to in this order as "CRI" (except when quoting material from the parties' briefs, which sometimes refer to CRI as "Continental").  Defendants are PXP Gulf Coast, Inc. ("PXPGC") and PXP Louisiana LLC ("PXPL").  Defendants are often referred to in this order as "the PXP defendants" or as "3TEC/PXP."  As discussed in the fact-findings portion of this order, the PXP defendants are the successors by merger of 3TEC Energy Corporation ("3TEC").  "The PXP defendants" or "3TEC/PXP" are designations which are used interchangeably, although this order attempts to use the "3TEC/PXP" designation when the acting party was 3TEC or when it seems especially important to recall the relationship between 3TEC and the PXP entities.

### B.  Claims.

The Amended Complaint alleges five claims against the PXP defendants.  In count I, CRI alleges that the PXP defendants breached the parties' written agreements.  In count II, CRI alleges that the PXP defendants breached their fiduciary duty to CRI.  In count III, CRI alleges that the PXP defendants breached their implied duty to perform their obligations to CRI in good faith and with fair dealing.  Also in count III, CRI alleges that the PXP defendants converted to their own use property which belonged to CRI.  Finally, in count IV, CRI alleges that it is entitled to an accounting

of certain oil and gas proceeds.  The PXP defendants have counterclaimed, seeking a declaratory judgment regarding the parties' respective rights, interests and obligations.  In their cross-motions for partial summary judgment, each party seeks an adjudication with respect to some, but not all, of the claims and issues raised in this action.

The standards that apply to motions for summary judgment are stated in Part II of this order.  Introductory fact-findings and conclusions of law are stated in Part III.  Part IV addresses the issues raised in CRI's motion for partial summary judgment, and Part V addresses the issues raised in the PXP defendants' motion for partial summary judgment.  Many of the issues raised in the motions are overlapping, so this order sometimes refers in Part IV to determinations made in Part V and *vice versa*.

## II.  Standards.

Under Rule 56(c), Fed. R. Civ. P., summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The moving party has the burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  All reasonable inferences to be drawn from the undisputed facts are to be determined in a light most favorable to the non-movant. United States v. Agri Services, Inc., 81 F.3d 1002, 1005 (10th Cir. 1996).  Once the moving party has met its burden, the opposing party must come forward with specific

evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

III. Introductory Fact-Findings and Conclusions of Law.

The following fact-findings are based on undisputed evidence. The court also sets out here certain conclusions of law as to which there is no disagreement. Many additional fact-findings and conclusions of law are stated in other parts of this order.

1. There is no dispute regarding the content of the written agreements which are material to this action. These written agreements are attached to the parties' moving papers as exhibits; they are comprised of the joint exploration agreement and the joint operating agreements described in paragraphs 2-5, below.

2. On May 4, 2000, 3TEC Energy Corporation and plaintiff CRI entered into an agreement called the "Joint Exploration Agreement, Breton Sound Area of Louisiana."[1] Unless otherwise stated, all references in the balance of this order to "the joint exploration agreement" are references to this particular joint exploration agreement concerning the Breton Sound Area. Article V of the joint exploration agreement addresses the Olympus Project area of mutual interest. Article VI of the joint exploration agreement addresses the Beta Prospect area of mutual interest. Both Articles V and VI provide that the non-acquiring party shall be entitled to participate in the acquisition of properties in the area of mutual interest pursuant to the terms, provisions and procedures provided for in the Olympus Project operating agreement, discussed below.

3. On April 1, 2000, 3TEC and CRI entered into two agreements, each called "Operating Agreement." These operating agreements are attached to and made

---

[1]This agreement is attached to plaintiff's moving brief (as Exhibit 5), and to defendants' brief in response to plaintiff's moving brief and to defendants' own moving brief (as Exhibit 1 in both cases).

a part of the Breton Sound Area joint exploration agreement.  One of these operating agreements pertains to the "Olympus Project."  This operating agreement is attached to the joint exploration agreement as  Schedule 5.[2]  Because, as mentioned above, the joint exploration agreement's provisions addressing both the Olympus Project area of interest and the Beta Prospect area of interest state that non-acquiring parties shall be entitled to participate in the acquisition of properties within these areas of interest pursuant to the terms of the Olympus Project joint operating agreement, unless otherwise stated, all references in the balance of this order to "the joint operating agreement," singular, are references to the Olympus Project joint operating agreement.

4.     The other operating agreement attached to the joint exploration agreement pertains to the Beta Prospect. The Beta Prospect joint operating agreement is attached to the joint exploration agreement as Schedule 8.[3]  All references in this order to the joint operating agreements, plural, are to the Olympus Project and Beta Prospect joint operating agreements.   (The material provisions of both operating agreements appear to be the same.)

5.     References in this order to "the parties' written agreements" or to "the parties' agreements," are references to the joint exploration agreement and the joint operating agreements just described.

6.     State of Louisiana lease (SL) numbers 17767, 17963, 17965 and 18340, are leases as to which the PXP defendants have now acquired an undivided 50% of 8/8ths working interest.  Defendants state that they acquired these undivided 50%

---

[2]A copy of the Olympus Project joint operating agreement, with its own exhibits, is attached to defendants' brief in response to plaintiff's moving brief, and to defendants' own moving brief (as Exhibit 2 in both cases).  A copy of the Olympus Project joint operating agreement is also attached to plaintiff's moving brief (as part of Exhibit 5).

[3]A copy of the Beta Prospect joint operating agreement is attached to plaintiff's moving brief (as a part of the joint exploration agreement at Exhibit 5).

interests "pursuant to" an exploration agreement between 3TEC and an entity which is not a party to this action, Century Exploration Company ("Century"),[4] while plaintiff contends that defendants agreed with Century to "jointly acquire these properties on a 50/50 basis in advance of acquisition."[5]  Regardless, it is undisputed that defendants now own an undivided 50% of 8/8ths working interest in these leases.

7.     The above-specified leases are physically located within the areas of mutual interest provided for in the joint exploration agreement and in the joint operating agreements between CRI and 3TEC/PXP.  The Aquarius Well was drilled on, and produces from, SL 17767.  The Aquarius Well is physically located within the parties' areas of mutual interest as described in the parties' written agreements.

8.     By merger agreement effective in June, 2003, 3TEC merged with Plains Production and Exploration Company.  The successor corporation was PXPGC, and PXPGC succeeded to the rights and interests of 3TEC.  All of PXPGC's rights and interests in and to the assets owned by PXPGC in the State of Louisiana were later assigned to PXPL.  As successors of 3TEC by merger, the PXP defendants (PXPGC and PXPL) now stand in the shoes of 3TEC for all purposes material to the instant motions.   Thus, for all purposes material here, the PXP defendants have assumed liability for any misconduct of 3TEC, and there is no distinction between 3TEC and the PXP defendants.

9.     Oklahoma adheres to Section 187 of the Restatement (Second) of Conflicts of Laws.  The Restatement provides for the application of the law of the state chosen by the parties in their  agreement.  The joint exploration agreement provides (in § 6.2) that the joint exploration agreement should be governed by and

---

[4]Defendants' moving brief, p. 3, statement of fact (SOF) nos. 10-14.

[5]Plaintiff's brief in response to defendants' moving brief, p. 5, responding to defendants' SOF no. 11.

construed in accordance with the laws of Texas.  The joint operating agreement provides (in Article XIV. ¶ B.) that it is governed by laws of the state in which the contract area is located. The state in which the contract area is located is Louisiana. However, the joint exploration agreement (in § 4.3) provides that in the event of any conflict between the terms of the joint exploration agreement and the operating agreements, the terms of the joint exploration agreement shall control.  For purposes of these motions, the parties have agreed that the court should apply the substantive law of the State of Texas.  Based on Oklahoma choice of law rules,[6] as well as the choice of law provisions in the parties' written agreements, and the parties' stipulation, the court concludes that the substantive law of Texas should determine these motions.

10.    It is undisputed that 3TEC/PXP did not offer CRI rights to acquire properties within the areas of mutual interest as 3TEC/PXP was required to do per the parties' written agreements.  Although the parties disagree as to why this breach of the parties' written agreements occurred--CRI contending that the breach was intentional and tortious, and the PXP defendants contending that it was an unintentional breach caused by incorrect information received at the time of the merger--the PXP defendants have admitted that they breached the parties' written agreements to this limited extent, and the court finds and concludes that they have.

IV. <u>Plaintiff's Motion for Partial Summary Judgment</u>.

Plaintiff CRI seeks partial summary judgment adjudicating the following:

_____

[6]Under <u>Klaxon Co. v. Stentor Electric Manufacturing Co.</u>, 313 U.S. 487, 496 (1941), a federal district court, sitting in diversity, must apply the conflict of laws rules of the forum state in order to determine what state's substantive law applies.

--That defendants, as successors by merger to 3TEC Energy Corporation, are liable for all pre-merger misconduct committed by 3TEC (addressed in Part IV. A. of this order);

--That the defendants have breached their written agreements with CRI, specifically, that defendants have breached the joint exploration agreement and the joint operating agreements in four respects (Part IV. B.);

--That the defendants owed CRI fiduciary duties and that defendants have breached those duties (Part IV. C.); and

--That the defendants had a duty to disclose material facts and that they breached that duty by concealing, failing to disclose and misrepresenting material facts surrounding the defendants' activities in the Breton Sound Area (Part IV. D.).

A.  The PXP Defendants' Liability for any Pre-merger Misconduct by 3TEC.

As previously noted, defendants do not dispute plaintiff's contention that the PXP defendants, as successors of 3TEC by merger, have liability for any pre-merger misconduct by 3TEC which CRI might ultimately establish.  Accordingly, this aspect of CRI's motion should be granted.

B.  The PXP Defendants' Alleged Breaches of the Parties' Written Agreements.

CRI argues that it is entitled to an adjudication that the following specific breaches of the parties' written agreements occurred:  (1) that the PXP defendants breached the joint exploration agreement by failing to offer CRI the opportunity to acquire CRI's working interest in state lease no. 17767 which includes the Aquarius Well, and in state lease nos. 17963, 17965 and 18340; (2) that the PXP defendants breached their written agreements because, under those agreements, CRI is entitled to a 10% of 8/8ths working interest in the Aquarius Well rather than a 5% of 8/8ths working interest as defendants contend; (3) that the PXP defendants breached the joint exploration agreement by refusing to pay CRI for its share of natural gas and oil and

condensate produced from the Aquarius Well; and (4) that the PXP defendants breached the joint exploration agreement and joint operating agreements by refusing to provide CRI with seismic information and by refusing CRI's requests to audit expenses and sales of gas from the Aquarius Well.

### 1.   CRI's Allegation that there was a Breach of the Parties' Written Agreements Because  Defendants Failed to Offer CRI the Opportunity to Acquire CRI's Working Interest in Certain Leases.

As stated in the introductory fact-findings and conclusions of law, the PXP defendants have conceded, and the court has concluded, that the PXP defendants breached their written agreements with CRI to some extent.  Specifically, the court concludes that contrary to requirements set out in the joint exploration agreement and the joint operating agreements, CRI was not offered the opportunity to acquire CRI's share in SL 17767, which includes the Aquarius Well, or in State of Louisiana lease nos. 17963, 17965 and 18340, when those leases were acquired by 3TEC/PXP. Regardless of the reason for the breach, the fact of the breach is not in dispute. Accordingly, CRI's motion should be granted with respect to this particular issue, with any damages to be established at trial.

### 2.   CRI's Alleged Entitlement Under the Parties' Written Agreements to a 10% Working Interest in the Aquarius Well.

CRI next requests summary judgment on its claim that the PXP defendants breached the parties' written agreements because, under the proper construction of those agreements, CRI is entitled to a 10% working interest in the Aquarius Well rather than a 5% working interest in that well as defendants contend.  This order often refers to this issue as the "5% or 10% issue."  This aspect of CRI's motion is couched

as a contract construction issue.[7]  Thus, a preliminary issue is whether the parties' written agreements are ambiguous with respect to the 5% or 10% issue.

Under Texas law, whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered into.  Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983).  If the written instrument is worded so that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous.  Id.  On the other hand, a contract is ambiguous if its meaning is uncertain and doubtful, or if it is reasonably susceptible to more than one meaning.  Id. at 393-34.

It is true in this case that the joint exploration agreement and joint operating agreements require careful reading.  That fact, however, does not render the agreements ambiguous.  After a careful reading of the provisions which pertain to the 5% or 10% issue, the court finds and concludes that the written agreements can be given a certain and definite legal meaning or interpretation, that they are not reasonably susceptible to more than one meaning, and that their plain meaning can be derived from the documents themselves.  This ruling is consistent with the view of the parties.[8]  Accordingly, the court concludes that the written agreements are unambiguous with regard to the 5% or 10 % issue.

---

[7]CRI's moving brief regarding the 5% or 10% issue relies on language in the written agreements and on Judy Eldridge's testimony confirming language read from those agreements. (Plaintiff's moving brief, pp. 18-20.)

[8]None of the parties argues that the joint exploration agreement or the joint operating agreements are ambiguous.  CRI's moving brief refers to "the plain language of the agreement" (at p. 19), and CRI states that "[t]he Court should adjudicate these [breach of contract] issues as a matter of law leaving the issue of damages for the jury." (At p. 17).  Defendants' response brief (at p. 19) states that the contracts are unambiguous and notes that neither party has alleged that the pertinent written contracts are ambiguous.  (At p. 19, n.4.)  Defendants' reply brief filed in association with its own moving brief also notes that neither party contends that the parties' written agreements are ambiguous.  (At p. 1.)

With that determination made, the next step is to set out general principles of contract interpretation under Texas law. After that, this order addresses defendants' arguments to the extent that those arguments rely upon particular provisions in the parties' written agreements. In the course of that discussion, this order quotes the provisions which are most material to this issue. Finally, the court states its conclusions regarding the proper interpretation of the parties' written agreements with respect to the 5% or 10% issue.

The Texas law of contract interpretation provides that in construing a written contract, the primary concern is to ascertain the true intentions of the parties as expressed in the instrument. Coker, 650 S.W.2d at 393. To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize its provisions and they should give effect to all the provisions of the contract so that none are rendered meaningless. Id. No single provision taken alone will be given controlling effect; rather, all provisions must be considered with reference to the whole instrument. Id.

In support of its position that it is entitled to 10% of 8/8ths working interest in the Aquarius Well under the contract language, CRI primarily relies on language found in the Olympus joint operating agreement, at Article III. B., in conjunction with Exhibits A and A-1 to the joint operating agreement. Art. III. B. of the joint operating agreement provides as follows.

> Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties...."

The above-referenced Exhibit A is a two-page document attached to the joint operating agreement.  Part I of Exhibit A is entitled "CONTRACT AREA."  Part I identifies that contract area as follows:  "Parts of Blocks 33 and 34 in Breton Sound Area in Plaquemines Parish, Louisiana, colored yellow on Exhibit 'A-1' attached hereto and made a part hereof."  Exhibit A-1 is a "Lease Map" for the Olympus Prospect, and it shows the boundaries and locations of the area of mutual interest. Part III of Exhibit A is entitled "PERCENTAGES AND ADDRESSES OF PARTIES TO THIS AGREEMENT."  The schedule which follows lists CRI as owning "10.00%" of the working interest.[9]

Although there is a dispute as to whether the Aquarius Well is covered by Exhibit A,[10] there is no dispute that the Aquarius Well is now physically located within the area which is "colored yellow on Exhibit A-1," that is, within the boundaries of the contract area referenced in Art. III. B. of the joint operating agreement.  Based on this fact, CRI's argument proceeds as follows:  the Aquarius Well is located within the yellow area on Exhibit A-1, so that the well comes within the definition of the contract area as described in Exhibit A, and so that the language in Article III, B. of the joint operating agreement (to which Exhibit A and A-1 are attached) which states that "...the parties shall also own all production of oil and gas from the Contract Area..." "as their interests are set forth in Exhibit A," means that

---

[9]The actual heading for the category in which "10.00%" appears, is "WI APO(4)."  Note (4) identifies the heading "WI APO" as an abbreviation for CRI's working interest "After Payout of the Second Exploratory Well drilling in the Olympus Project and all subsequent wells."

[10]There is a dispute because, among other reasons, Part IV of Exhibit A is entitled "IDENTIFICATION OF OIL AND GAS LEASE SUBJECT TO THIS AGREEMENT" and the Aquarius Well had not been drilled, and the lease within which it was later included had not been acquired, at the time of these agreements.  Accordingly, SL 17767 (the lease which includes the Aquarius Well) is not among the leases identified as oil and gas leases subject to this agreement, and that lease, along with SL nos. 17963, 17965 and 18340, are not mentioned in this document.

CRI is entitled to 10% of the working interest in the Aquarius Well because 10% is CRI's percentage share of the working interest as shown on Exhibit A.

Based on this argument, CRI contends that it is entitled to a 10% of 8/8ths share of the working interest in properties (such as the lease which includes the Aquarius Well and the other leases in issue here) which were acquired after the date of the joint exploration agreement and the joint operating agreement.[11]  Put differently, CRI contends that per the above-referenced provisions,[12] it is entitled to a fixed 10% of an 8/8ths working interest in any and all production from properties acquired after the date of the parties' written agreements if the properties are physically located within the areas of mutual interest, without regard to what percentage interest the PXP defendants ultimately and actually acquire in those properties.

The court has already found that the interest which the PXP defendants eventually acquired in the Aquarius Well is an undivided 50% of an 8/8ths working interest.  This is because 3TEC/PXP acquired a 50% of 8/8ths working interest in SL 17767 in which the Aquarius Well is located.  Likewise, 3TEC/PXP acquired a 50% of 8/8ths working interest in SL nos. 17963, SL 17965 and SL 18340.  As applied to these facts, CRI's interpretation of the parties' agreements would entitle CRI to 10% of an 8/8ths working interest in the Aquarius Well despite the fact that defendants acquired only a 50% interest in that well.  In other words, CRI argues that it is entitled to 20% of the PXP defendants' 50% working interest in the Aquarius Well and the leases which are the subject of this action.

---

[11]As stated in the fact-findings, the joint exploration agreement is dated May 4, 2000 and the joint operating agreements are dated April 1, 2000.

[12]CRI also relies on some other provisions in the parties' written agreements, such as references to CRI's residual working interest, a reference which is discussed later in this order. Whether or not expressly discussed in this order, the court has considered all of the provisions in the agreements which CRI relies upon, all of the evidence which CRI has put forward, and all of CRI's arguments and authorities with respect to every issue raised by these motions.

In response to CRI's position, the PXP defendants argue that the parties' written agreements provide that the acquiring party (the PXP defendants in this instance) were only required to offer the non-acquiring party (CRI in this instance) the opportunity to acquire a 10% interest *in whatever interest was ultimately acquired.* Based on the fact that the PXP defendants acquired only a 50% working interest in the Aquarius Well, defendants contend that CRI should have been given the opportunity to acquire 10% of the defendants' 50% of 8/8ths working interest in that well and the other leases, that is, 5% of an 8/8ths working interest in these interests.

In support of their position, the PXP defendants make the over-arching argument that their interpretation is the only one which is consistent with principles of Texas contract construction law.  For example, defendants argue that their interpretation does not single out any one provision but takes all contract provisions into account and considers the contract as a whole.  Defendants argue that their interpretation of the contracts gives meaning to all provisions in the parties' written agreements and does not read any provision out of the agreements.  Defendants argue that their construction creates no absurdities.  Defendants argue that specific provisions control over general provisions, and that specific provisions regarding the areas of mutual interest therefore control the 5% or 10% contract construction issue here.  Defendants also argue that their interpretation is consistent with the plain meaning of various contract provisions.  In this last regard, defendants point to several provisions in the parties' written agreements, and the court reviews those provisions next.

Defendants point out that even if the court were to look at the provision which CRI relies most heavily upon in isolation--Article III.B. of the joint operating agreement--that provision begins with the statement that it applies "[u]nless changed by other provisions."  Defendants argue that CRI's interpretation, even if otherwise

correct, is changed or modified elsewhere in the written agreements so that even Art. III. B., standing alone, does not support CRI's interpretation of the parties' contracts.

Defendants also rely on Articles V and VI of the joint exploration agreement. Art. V addresses the Olympus Project area of mutual interest and Art. VI addresses the Beta Prospect area of mutual interest. As noted in the fact-findings, both Art. V and Art. VI provide that the non-acquiring party shall be entitled to participate in the acquisition in the area of mutual interest pursuant to the terms, provisions and procedures provided for in the Olympus Project Operating Agreement. Defendants argue that these provisions specifically govern the areas of mutual interest, and that as the areas of mutual interest provisions are the contract provisions which most specifically apply to later-acquired interests, that Art.V and Art. VI  specifically govern any later-acquired leases and wells in issue here.

Art. V and Art. VI of the joint exploration agreement both provide as follows.

If any oil, gas or mineral lease, <u>or interest therein or portion thereof</u>, or any royalties or mineral interests covering and affecting any lands situated within the Olympus Area of Mutual Interest, shall be acquired by any party hereto, then the non-acquiring party or parties <u>shall be entitled to participate in the acquisition thereof</u> pursuant to the terms, provisions and procedures provided for in the Olympus Project Operating Agreement.  (Emphasis added by the court.)

Defendants argue that this language entitles CRI, as the non-acquiring party,  to its percentage interest as stated in the joint operating agreement (10%) but only as that percentage is applied to the acquiring party's acquired interest in the area of mutual interest.  In this case, defendants argue, the acquired interest is 50% of 8/8ths working interest, so that CRI's 10% interest in the acquired interest yields it the right to acquire a 5% of 8/8ths working interest in the described leases and the Aquarius Well.

Defendants also rely on provisions in the joint operating agreement. It is undisputed that the leases are located within the Olympus Project and Beta Prospect areas of mutual interest. Those areas of mutual interest are specifically addressed by Article XV. H. of the joint operating agreement. Article XV.H. is entitled "AREA OF MUTUAL INTEREST" and it states as follows.

> The parties hereto hereby create an Area of Mutual Interest (AMI) comprising of the acreage outlined in black on Exhibit "A-1". This AMI shall remain in force and effect for a period of two (2) years from the expiration of the last leases or leases within the AMI.

> During the term of this AMI if any party hereto ("Acquiring Party") acquires any oil and gas lease or any interest therein, any unleased mineral interest or any farmouts or other contracts with respect thereto which affects lands and minerals lying within the AMI ("Acquired Interest")[,] the Acquiring Party shall promptly advise each of the other parties hereto of such acquisition. In such event, each party shall have the right to acquire its proportionate interest in such Acquired Interest by paying its share of the actual acquisition costs for such Acquired Interest. (Emphasis added.)

Finally, defendants rely on Article IV, §4.3 of the joint exploration agreement. Art. IV. § 4.3 is entitled "Conflicts." It provides that "[i]n the event of any conflict" between the joint exploration agreement and the joint operating agreement, the terms and provisions of the joint exploration agreement "shall control." Thus, defendants argue that in the event that the court might be persuaded by CRI's interpretation of Art. III. B. of the joint operating agreement, that interpretation would be in conflict with the joint exploration agreement's provisions regarding the areas of mutual interest (Art. V and Art. VI) so that the joint exploration agreement would control and override any conflicting interpretation of the joint operating agreement.

Having carefully considered the arguments of all parties, the court states its findings and conclusions with respect to the 5% or 10% issue as follows.

Oil and gas interests which were yet to be acquired at the time of the parties' written agreements, and which are now physically located within the areas of mutual interest, are governed by those provisions in the parties' agreements which specifically apply to the areas of mutual interest. As set out in Art. XV. H. of the joint operating agreement, the provision which is specifically entitled "AREA OF MUTUAL INTEREST," CRI is clearly entitled to its "right to acquire its proportionate interest <u>in such Acquired Interest</u>." (Emphasis added.) As used in this provision, "acquired interest" plainly refers to interests which are acquired after the date of the written agreements and which are located within the areas of mutual interest. Such "acquired interests" therefore include SL 17767, which in turn includes the Aquarius Well, and SL nos. 17963, SL 17965 and SL 18340. In all of these leases, the PXP defendants' acquired interest is 50% of an 8/8ths working interest. Under the plain language of Art. XV. H., CRI was entitled to be offered its "proportionate interest in such Acquired Interest." The 10% proportionate interest set out in Exhibit A of the joint operating agreement applied to the acquired interest. As the PXP defendants' acquired interest was 50% of 8/8ths of the working interest in the leases, CRI's 10% share of the acquired interest entitled it to the opportunity to participate to the extent of 5% of an 8/8ths working interest in SL 17767, which includes the Aquarius Well, and in SL nos. 17963, 179656 and 18340.

This interpretation of the joint operating agreement is consistent with Art. V and Art. VI of the joint exploration agreement. These articles clearly state that the "non-acquiring party or parties shall be entitled to participate <u>in the acquisition thereof</u>," pursuant to the terms of the joint operating agreement. (Emphasis added.) The court also agrees with defendants that in the event of any conflicting interpretation between these articles and the provisions in the joint operating

agreement upon which CRI relies, these articles of the joint exploration agreement would control.

Furthermore, contrary to CRI's position, the court finds and concludes that the "contract area" defined by Exhibit A to the joint operating agreement, by its own terms (see joint operating agreement, Exhibit A, Part IV), applies only to certain oil and gas leases which are identified in Exhibit A and which existed at the time the joint operating agreement was entered into, and does not apply to leases which were yet to be acquired within the areas of mutual interest.

The court's interpretation of the parties' agreements is consistent with the plain meaning of Art. XV. H. of the joint operating agreement and Art. V and Art. VI of the joint exploration agreement (the provisions which are most specifically applicable to later-acquired interests within the area of mutual interest), it is an interpretation which is reasonable in light of the parties' agreements read as a whole, unlike CRI's proposed interpretation of the contracts. For example, the court's interpretation keeps the parties in the same position with respect to their relative risks and rewards, a result clearly contemplated by the entirety of the parties' written agreements.[13] By contrast, any time that the PXP defendants acquired less than 8/8ths of a working interest in a lease, CRI's "fixed 10%" interpretation would result in the parties owning interests disproportionate to the relative risks and rewards contemplated by the contracts. To illustrate: if the PXP defendants acquired 50% of a working interest (as they did in this case), then per CRI's view, CRI would be entitled to 20% of the PXP defendants' acquired working interest. In this manner, under CRI's interpretation of the contracts, the proportional interests of the parties set out in Exhibit A to the joint operating

---

[13] This interpretation comports with one of the fundamental premises that commonly underlie AMI agreements, *viz:* that the proportionate sharing of risks and rewards will apply consistently to all operations and transactions which are governed by the agreement.

agreement would change whenever PXP acquired less than 8/8ths of a working interest. Extending the example further: under CRI's interpretation of the contracts, if the PXP defendants acquired 10% of an 8/8ths working interest in a lease within in the areas of mutual interest, defendants would then be required to offer CRI the opportunity to acquire defendants' entire 10% interest. The court accordingly concludes that CRI's interpretation of the parties' written agreements is unreasonable.

The court's interpretation of the parties' agreements also avoids absurdities, unlike CRI's interpretation. Under CRI's interpretation, not only could the parties' respective interests become so disproportionate as to create absurd allocations of risk and reward, CRI's position that it is always entitled to acquire a fixed 10% of 8/8ths working interest would create absurd or impossible results if the PXP defendants acquired less than 10% of 8/8ths working interest in a lease within the area of mutual interest. For example, if the defendants acquired only a 5% interest in a lease within the area of mutual interest, according to CRI, CRI would still be entitled to its fixed a 10% of 8/8ths working interest in that lease.

The court further finds and concludes that CRI's interpretation of the parties' agreements would render portions of Art. XV. H. of the joint operating agreement meaningless. Paragraph H states that the area of mutual interest provisions applies "if any party hereto ("Acquiring Party") acquires any oil and gas lease *or any interest therein*...." (Emphasis added.) The phrase "or any interest therein" clearly contemplates the possibility that 3TEC/PXP might acquire an interest which is less than an entire 8/8ths working interest. CRI's interpretation of the contract reads this phrase out of the contract. Otherwise, any time the PXP defendants acquire just "an interest" in a lease rather than a full 8/8ths working interest in a lease, the proportionality requirements of Art. XV. H. and of and Exhibit A are rendered meaningless or render unreasonable or absurd results. In the same manner, CRI's

construction of the parties' agreements would render meaningless the phrase "or interest therein or portion thereof" included in Art. V and VI of the joint exploration agreement.

CRI's construction also ignores the fact that the term "contract area," which CRI relies so heavily upon, never appears in any provisions which specifically deal with the areas of mutual interest created under the agreements.

CRI also relies on the agreements' use of the term "CRI's Residual Working Interest," a term defined in Article I of the joint exploration agreement, as support for its view that it is entitled to a fixed 10% working interest in the after-acquired Aquarius Well.[14] The article in the joint exploration agreement which addresses CRI's residual working interest, however, is Article III.  That article deals only with CRI's residual working interest in the "subject leases," a defined term under the contract which means "the oil and gas leases or portions thereof described on Schedule 4 hereto, save and except for the Breton Sound Discovery Well and production of oil or gas from Excluded Reservoirs."  (Joint Exploration Agreement, Article I, p.5.) Schedule 4 describes then-existing leases identified on Exhibit A to the Olympus Project joint operating agreement.  The "subject leases" do not include any of the leases with which this lawsuit is concerned.  Thus, "CRI's Residual Working Interest" is a term which quantifies CRI's interests in the existing "subject leases," not the leases involved in this lawsuit.  The written provisions which specifically address the areas of mutual interest do not use the term "CRI's Residual Working Interest."  CRI's reliance on that term is unfounded.

Thus, the court finds and concludes that under the applicable provisions, and reading all parts of the parties' written agreements together, the parties' agreements

---

[14]In the definitions section at Art. I, p.2, the joint exploration agreement states:  "CRI's Residual Working Interest" means an undivided ten percent (10%)."

plainly provide that a non-acquiring party shall have the right to acquire its proportionate interest but only as that share is applied to the acquiring party's acquired interest.  (See Art. XV.H. of the joint operating agreement, and Art.V and Art. VI of the joint exploration agreement.)  The result of this construction of the contracts is that CRI was entitled to be offered 10% of the PXP defendants' 50% of 8/8ths working interest in the leases which are the subject of this dispute and which include the Aquarius Well, which is equal to a 5% of 8/8ths working interest.  This is the result after applying the only construction of the parties' written agreements which makes sense and which does not create absurdities.  This interpretation harmonizes and gives effect to all provisions in the parties' agreements so that no parts are rendered meaningless.  This interpretation is consistent with the rule that more specific provisions override more general provisions in the event of a conflict.  This interpretation does not give any single provision, taken alone, controlling effect, as CRI's interpretation would do.  Rather, this construction interprets all parts of the parties' agreements with reference to the whole.

Accordingly, the court agrees with the PXP defendants' position regarding the correct interpretation of the parties' written agreements with respect to the 5% or 10% issue and rejects CRI's position on this issue.  CRI's request for summary judgment adjudicating that it is entitled to a 10% interest in the Aquarius Well and other later-acquired leases should therefore be denied.

### 3.   The PXP Defendants' Alleged Breach of the Joint Exploration Agreement By Refusing to Pay CRI its Share of Natural Gas, Oil and Condensate Produced from the Aquarius Well.

CRI next asks the court to determine as a matter of law that the PXP defendants breached the joint exploration agreement by refusing to pay CRI its share of natural

gas oil and condensate produced from the Aquarius Well.  The defendants' do not respond to this aspect of plaintiff's motion, and they do not contend that they have paid CRI its claimed share of the Aquarius Well proceeds.  Based on the pleadings, the record, and the parties' theories of this case, the court finds and concludes that there is no dispute regarding this issue and that it should be determined in CRI's favor. The court hereby adjudicates liability for this particular breach of the parties' agreements in CRI's favor, with any damages for this breach to be established at trial.

   4.   The PXP Defendants' Alleged Breach of the Joint Exploration
        Agreement and Joint Operating Agreements by Refusing CRI
             Seismic Information and Other of CRI's Alleged Rights.

   CRI also argues that the court should determine as a matter of law that the PXP defendants breached the joint exploration agreement and joint operating agreements by refusing to allow CRI to inspect and review seismic and geological data pertaining to lands within the areas of mutual interest.  CRI states that the defendants further refused CRI's request to audit expenses and sales of gas from the Aquarius Well.  The defendants have not responded to CRI's request for summary judgment regarding liability for this particular alleged breach.[15]  Based on the pleadings, the record, and the parties' theories of this case, the court finds and concludes that there is no dispute regarding this issue and that it should be determined in CRI's favor, with any damages for this particular breach to be established at trial.  This order now moves from consideration of CRI's breach of contract claims to consideration of its tort claims for

---

[15]This portion of CRI's brief cites CRI's proposed undisputed fact no. 50. The defendants do not controvert undisputed fact no. 50, except to the extent that they object to fact no. 50's characterization of a meeting as a "partners meeting."  The defendants do not dispute the balance of fact no. 50, which states that when CRI made demand for its interest and requested an audit of the Aquarius Well, PXP refused the demand and the audit request.

breach of fiduciary duty, breach of the implied duty of good faith and fair dealing, and conversion.

> C. <u>CRI's Request for an Adjudication that the PXP Defendants Owe Fiduciary Duties and that Defendants Breached those Duties</u>.

CRI moves for an adjudication that the PXP defendants owe CRI fiduciary duties and that defendants have breached those duties.  There are two types of fiduciary relationships recognized in Texas law, formal and informal.  <u>Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.</u>, 48 S.W.3d 865, 878-879 (Tex. App.-Houston, 2001).  A formal fiduciary relationship arises as a matter of law.  <u>Id</u>. An informal fiduciary relationship may arise from a moral, social, domestic or purely personal relationship of trust and confidence and is generally called a confidential relationship.  <u>Id</u>.  In this action, CRI alleges that the defendants have a formal fiduciary duty to CRI which arises from the parties' written agreements.[16]  Pursuant to Texas law, formal fiduciary duties arise as a matter of law when the parties are joint venturers, partners, or principal and agent.  <u>Id</u>.  In support of its view that the PXP defendants are fiduciaries of CRI, CRI argues that the parties' written agreements create each of these relationships between CRI and the PXP defendants.  Specifically, CRI relies on the parties' written agreements regarding the areas of mutual interest as

---

[16]"CRI claims a formal fiduciary relationship as a result of joint venture, partnerships and agency, not an informal fiduciary relationship due to prior dealings."  (Plaintiff's response brief to defendants' moving brief, at p. 7, ¶ 19.)

stated in the joint operating agreements, as creating each of these relationships.[17]  (*See*
plaintiff's moving brief, pp. 21-22.)

1. Joint Venture and Partnership.

Whether the given facts in a particular case establish the existence of a joint
venture or partnership, or whether the evidence raises a fact issue on the question, is
an issue of law to be determined by the court.  *See*, Austin Transp. Study Policy
Advisory Comm. v. Sierra Club, 843 S.W.2d 683, 691 (Tex. App.-Austin 1992, writ
denied) (stating this rule with respect to joint ventures).   As the party seeking to
impose the relationship, CRI has the burden to prove the existence of a partnership or
joint venture.  Rogers v. Butler, 563 S.W.2d 840, 842-43 (Tex. Civ. App.-Texarkana
1978, writ ref'd n.r.e.)  In this case, the parties agree that the requirements which must
be met in order for either a partnership or a joint venture to be recognized under Texas
law are similar.  Both sets of parties cite Sclumberger Tech. Corp. v. Swanson, 959
S.W.2d 171, 176 (Tex. 1997) for the rule that a partnership or a joint venture requires
four elements:  (1) a community of interest in the venture, (2) an agreement to share
profits, (3) an agreement to share losses, and (4) a mutual right of control or
management of the enterprise.  *See*, *id*. (stating these were the elements submitted to
the jury, and also citing the Texas Uniform Partnership Act).  If there is no evidence
of any one of these elements, then there is no joint venture and no partnership.  *Id*.

---

[17]CRI's moving brief singles out the "AMI Agreements" for detailed treatment in this regard.
(See heading of plaintiff's moving  brief, III. C. 2., at p. 21.)  In support of CRI's view that these
relationships existed, CRI's briefing also references (at moving brief, p. 26, citing CRI's statement
of material fact no. 22 at p. 7 and including n.4) certain examples which CRI contends show that the
parties "had mutual rights to control acquisition and development of the AMIs contemplated by their
JOA and accompanying JOAs."  Those examples, included at CRI's statement of fact no. 22, only
provide the parties with rights to propose and elect, however, not mutual control.  (The one
exception might be the parties' right to control press releases, news releases or information
regarding the project, as set forth at § 6.7 of the joint exploration agreement.  However, that
provision is immaterial to the issues in this case.)

In support of its view that these elements are satisfied and that the parties were joint venturers, CRI relies primarily on three cases. The first is <u>Sparks v. Baxter</u>, 854 F.2d 110 (5th Cir. 1988) (applying Texas law). <u>Sparks</u> considered whether there was evidence to support the jury's finding that the parties were joint venturers in their oil and gas projects. *Id*. at 113. The court found that there was evidence to support this conclusion because there was evidence:  that the parties had "a mutual right of control," that they "worked in tandem" with "coordinated efforts," that one party "arranged for potential investors" while another party "made the presentations," and that "there was a mutuality of control of the activities." *Id*. CRI has offered no such evidence in this case. In fact, the undisputed evidence in this case is that the joint exploration agreement specified that "[i]t is not the purpose or intention of this Agreement to create, and this Agreement shall never be construed as creating, a joint venture, mining partnership or other relationship whereby any party shall be held liable for the acts, either of omissions or commission, of any other party hereto." (Joint exploration agreement, § 6.1.)  Consistent with this disclaimer of any joint venture or partnership, Art. V.A. of the joint operating agreements gives "full control of all operations on the Contract Area" to 3TEC/PXP as the operator.

The next case which CRI relies on for its position that a joint venture was created here is <u>Rankin v. Naftalis</u>, 557 S.W.2d 940 (Tex. 1977). Although the Texas Supreme Court recognized in <u>Rankin</u> that a fiduciary duty existed in that case, this recognition was based on the jury's finding that the parties "were jointly engaged in the business of operating the...lease...." *Id*. at 943. Thus, the <u>Rankin</u> jury explicitly found that the parties in that case were joint operators. This is unlike the present situation, where 3TEC/PXP is the only operator of the leases in question. <u>Hamilton v. Texas Oil & Gas Corp.</u>, 648 S.W.2d 316, 321 (Tex. App.-El Paso 1982, writ ref'd n.r.e.), a case which held there was no joint venture and no fiduciary relationship

between the owners and the operator, recognizes the narrowness of the holding in
Rankin.  Hamilton suggests that the appellant in that case, Hamilton, incorrectly cited
Rankin for the proposition that a fiduciary relationship exists between operators and
owners of oil and gas leases as a matter of law.  Hamilton states that Rankin would
establish fiduciary duties only upon a finding of joint venture.  *Id.* at 321.  Hamilton
goes on to observe that there, as in the case at bar, the operator "had full control of all
operations" so that the parties were severally, not jointly, liable under the joint
operating agreement.  *Id*.

CRI also relies on Fuqua v. Taylor, 683 S.W.2d 735 (Tex. App.-Dallas, 1984).
Although Fuqua found that the parties were joint venturers for the development of a
particular oil and gas lease and that their relationship was fiduciary, those fiduciary
duties only extended to the specific lease which was within the letter agreement and
did not extend to another lease.  *Id*. at 738.  There is no discussion in Fuqua of any
language in the pertinent agreements which disavowed a joint venture relationship or
intention, and Fuqua notes that "the pertinent facts in the instant case are undisputed."
*Id*. at 737-38.  The existence of a joint venture may have been one of the undisputed
facts in that case.

In short, the principal cases relied upon by CRI for the proposition that the
parties in this action were joint venturers are of no real help to CRI here.  On the other
hand, as stated in Hamilton, 648 S.W.2d at 320-21, Texas law provides that "[j]oint
owners of an oil and gas lease, may contract for the operation of leases by one of them
and for the operator, in the event of success, to pay to the other joint owners one-half
of the proceeds of the sale of the oil and gas less the expenses of finding it, without
creating a joint venture or a mining partnership."  *Id*., citations omitted.  Hamilton
notes that in Ayco Development Corporation v. G.E.T. Service Co., 616 S.W.2d 184,
185 (Tex. 1981), the Texas Supreme Court reiterated the elements necessary to

establish a joint venture, including the mutual right of control or management of the enterprise. Hamilton, 648 S.W.2d at 321. While the claims in the instant action are different from the claims in Hamilton,[18] the general rule reviewed in that case is still applies: absent mutual right of control or management of the enterprise, the elements necessary to establish a joint venture between owners and operators under the provisions of a joint operating agreement are insufficient for that purpose. As was true in Hamilton, the element of mutual control or management of the enterprise is not present here, where the parties' written agreements expressly disavow the creation of any joint venture or partnership and give "full control" of all operations to 3TEC/PXP.

Because it fits well here, the court discusses one more case at this point, Norman v. Apache Corporation, 19 F.3d 1017 (5th Cir. 1994) (applying Texas law), although that case is raised in the briefing of defendants' motion, not plaintiff's motion. In Norman, the relevant language in a letter agreement was construed to not expressly negate the existence of a fiduciary relationship between the parties, because that language was interpreted as addressing only the relationship of the operator and owners to third parties rather than the parties' relationship to each other. Id. at 1024. The parties in that case did not argue that their relationship of owners and operator should be classified as a partnership, a joint venture or an agency. Id. at 1025. But plaintiffs contended that the lower court had erred in granting summary judgment on their fiduciary duty claim because they thought they had produced evidence to raise a genuine fact issue on that claim. Id. at 1025.

Unlike Norman, in the instant case, the disavowing language follows the heading in the joint exploration agreement for § 6.1, which is expressly entitled "Relationship of Parties." The joint operating agreements also make clear that the

---

[18]For example, there are no claims here that the defendants improperly operated any leases.

parties intended their disavowal of any partnership or joint venture to apply to their relationship to each other.   Article VII of the joint operating agreement reads as follows.

> The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area....  It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

The last-quoted sentence flatly states the intention of the parties not to create a partnership or association *or* to be rendered liable as partners.  In <u>Castle Texas Production Limited Partnership v. Long Trusts</u>, 134 S.W.3d 267, 277-78 (Tex. App.-Tyler 2003, pet. denied) the same language was a factor in the court's determination that there was no fiduciary relationship or agency between the parties.  <u>Norman</u> included no such language.[19]  Moreover, <u>Norman</u> confirms that "[u]nder Texas law," evidence of a joint operating arrangement to develop a particular lease in and of itself will not support a finding of a broader relationship such as a partnership or joint venture.  *Id*. at 1024-25, quoting <u>Rankin</u>, and then citing <u>Hamilton</u> and other authorities discussed in this order.  In short, whereas the language used in the letter agreement in <u>Norman</u> did not negate the existence of a fiduciary relationship (or a partnership or a joint venture or an agency, although these specific points were not argued) between the parties to that agreement, here, the joint exploration agreement and in the joint operating agreements do effectively negate these relationships.

---

[19]The <u>Norman</u> letter agreement stated:  "This agreement does not constitute or create a joint venture or partnership, mineral or otherwise, or association, or agency or a fiduciary relationship of any kind or character <u>whereby any party hereto shall become liable for the acts and deeds of any other party hereto....</u>"  <u>Norman</u>, 19 F.3d at 1024 (emphasis added).

In analyzing the required elements of a partnership or joint venture the court should consider not only the common law elements and factors but also the statutory factors indicating creation of a partnership in Texas. Tex. Rev. Civ. Stat. Ann., art. 6132b-2.03(a). The statutory factors which indicate creation of a partnership in Texas include: (1) receipt or right to receive a share of profits of the business; (2) expression of an intent to be partners in the business; (3) participation or right to participate in control of the business; (4) the sharing or agreeing to share losses of the business or liability for third-party claims against the business; and (5) contributing or agreeing to contribute money or property to the business.

> a. Receipt or Right to Receive a Share of Profits of the Business.

Here, the parties never agreed to share in each others' profits "of the business." For example, CRI was not entitled to any profit from an interest subject to the area of mutual interest agreements unless CRI made its own, independent decision to purchase its share of the property. The parties' prospective profits derive from their separate ownership of the property in question, not from any partnership or joint venture or from any right to receive a share of each other's business profits.

> b. Expression of an Intent to be Partners.

The court's earlier analysis of the parties' expression of their intention not to create a partnership or joint venture covers this point. Although the manner in which the written agreements characterize or label the parties' relationship is not conclusive in determining whether a partnership has been created under the Texas Uniform Partnership Act, Howard Gault and Son, Inc. v. First National Bank of Hereford, 541 S.W.2d 235, 237 (Tex. App.-Amarillo 1976), CRI offers almost no evidence to

indicate that the parties' relationship was different from the intended relationship as expressed in the written agreements.[20]

      c. <u>Participation or Right to Participate in Control of the Business</u>.

Texas law provides that unless parties to a joint operating agreement are contractually given the mutual right of control or management of the enterprise, no formal fiduciary relationship can arise from such an agreement. <u>Ayco Development Corporation v. G.E.T. Service Company</u>, 616 S.W.2d 184, 186 (Tex. 1981) (contract which wholly excluded party from participation in the drilling, operation, and control held not a joint venture as a matter of law); <u>Norman</u>, 19 F.3d at 1024-26 (upholding summary judgment adjudicating no fiduciary relationship under joint operating agreement); <u>Castle Texas Production Limited Partnership</u>, 134 S.W.3d at 277-78 (well operator did not owe fiduciary duty under the joint operating agreement and there was no agency, where joint operating agreement provided no mutual right of control and gave "full control" of all operations to the operator; trial court's submission of punitive damage issue on conversion and breach of fiduciary duty claims was error).

Similarly in this case, the plain language of the parties' written agreements negates any finding that there was a mutual right of control over acquisition of new properties within the areas of mutual interest. In addition to the provisions already quoted in this order, the joint exploration agreement's provisions regarding the areas of mutual interest state that "if" a party acquires a leasehold interest within the area

---

[20]CRI argues (in its moving brief at p. 29, and in its reply brief at pp. 6-7), that the parties consistently referred to one another as "partners," that they held "partner meetings," and that a 3TEC vice-president referred to the agreements as a "joint venture." These facts are controverted, although the court takes them as established for purposes of considering defendants' motion. Even doing so, the court finds that these expressions are not enough, as a matter of law, to establish the existence of a legal partnership or joint venture, in the face of the parties' rights and obligations as formally set out in their written agreements. This is especially so given the lack of any evidence to suggest that the parties ever acted in a manner which created or suggested the existence of a partnership or joint venture.

of mutual interest, then the non-acquiring party shall be entitled to participate in the acquisition thereof pursuant to the terms of the Olympus joint operating agreement. (Joint exploration Art. V., Art. VI.)  This participation is as to ownership, not control or management of the venture or "the business."  Consistent with this understanding, the joint operating agreement also provides that "if" a party acquires a leasehold interest within the area of mutual interest, then the non-acquiring party has the right to acquire its proportionate interest in such acquired interest.  (Joint operating agreement, Art. XV.H.)  There is no evidence that either party exercised any right of control over the other regarding the acquisition of interests within the areas of mutual interest.

d.  <u>Sharing or Agreeing to Share Losses of the Business<br>Or Liability for Claims by Third Parties Against the Business</u>.

In the same way that the parties' written agreements provided for no sharing of profits, the agreements also provided for no sharing of losses.  The PXP defendants could buy a worthless leasehold interest and CRI would incur no loss unless CRI made its own independent business decision to buy its proportionate share in the PXP defendants' acquired property.  The previously cited provisions also provide that liability is several, not joint or collective.  (Joint operating agreement, Art. VII. A.) The parties' prospective losses and profits derive simply from ownership of the property in question, not from any partnership or joint venture.

e.  <u>Contributing or Agreeing to Contribute Money or Property to the Business</u>.

The same principle applies to this issue.  Payments were apportioned for costs and separate property interests were acquired, but money or property was not "contributed...to the business" in the sense contemplated by the statute.

In summary, having considered both common law and statutory authorities, the court rejects CRI's position that a fiduciary relationship was created by the parties'

-33-

written agreements. (Nor were any such relationships created by the manner in which individuals referred to the parties' relationship or venture. There also is no evidence that the parties conducted themselves as partners or joint venturers.) The court finds and concludes that CRI's motion for a partial summary judgment requesting an adjudication that the PXP defendants are fiduciaries of CRI, based on CRI's argument that the parties were partners or joint venturers, should be denied.

## 2. Agency.

CRI next argues that the PXP defendants were the agents of CRI and that this agency relationship created a fiduciary duty by the defendants to CRI. As set out in CRI's moving brief, CRI's primary contention in this regard is as follows.[21]

> Here, it is undisputed PXP agreed to be CRI's agent for the purpose of selling natural gas produced and property acquired pursuant to their agreements. The existence of this agency relationship creates a fiduciary duty on the part of PXP in its dealings with CRI. The fiduciary relationship extends to all of PXP's dealings with CRI. *See*, Abetter Trucking Co. v. Arizpe, 113 S.W.3d 503, 510 (Tex. App.-Houston [1st Dist.] 2003).

(Plaintiff's moving brief, pp. 30-31.) Thus, CRI attempts to boot-strap an agency which arguably exists (but which defendants dispute) for purposes of the sale of gas from the "subject leases," to an agency with respect to the PXP defendants' duties concerning later-acquired leases and wells within the areas of mutual interest.

---

[21]CRI also makes the argument that "PXP further agreed to act as CRI's agent in acquiring property and to offer CRI its 10% share in such property." (Plaintiff's moving brief, p. 31.) CRI includes no citation to the written agreements in support of this proposition, however, and the PXP defendants state that there is no such provision. The court has located no such provision and presumes that in support of this proposition, CRI relies on each party's agreement to offer the other party participation rights when and if leases were later acquired in the areas of mutual interest by the first party. Such an agreement, however, is not an agreement "to act as CRI's agent in acquiring property."

For an agency to exist, the principal must have control of both the means and the details of the process by which the agent is to accomplish its task. Coleman v. Klockner & Co. AG, 180 S.W. 3d 577, 588 (Tex. App.-Houston, 2005, no pet.)  The provision in the May 8, 2000 amendment to the joint exploration agreement which CRI relies on gives CRI no control with respect to the sale of gas.  (See Ex. 10 to CRI's moving brief, May 8, 2000 amendment to the joint exploration agreement.)  Moreover, the finding in Abetter (the case quoted above) of a fiduciary relationship based on an agency, does not support CRI's position here.  The limited agency relationship recognized in Abetter was the "key" employer-employee relationship pursuant to which broad responsibilities were assigned to the employee by his employer.  Id. at 510.  Contrary to the manner in which CRI attempts to extrapolate an agency relationship, Abetter discusses the fact that the employee/agent did not owe his principal a fiduciary duty with respect to all dealings between the parties.  See, id. (fiduciary relationship does not preclude fiduciary from making preparations for a future competing business venture, and employee has no general duty to disclose his plans and may secretly join with other employees in the endeavor without violating any duty to the employer).  Finally, consistent with a tone which suggests that a court should generally be cautious in recognizing agency relationships, Abetter notes that courts should be careful in defining the scope of the fiduciary obligations of an employee when acting as the employer's agent in the pursuit of business operations. Id.

The court finds and concludes that CRI has not shown that any agency existed with respect to any matters at issue in this action.  Accordingly, CRI's motion for an adjudication that the PXPL defendants had CRI fiduciary duties, based on the existence of an agency relationship which existed as a matter of law, should be denied.

### 3.  Defendants' Argument that the Texas Independent Injury Rule Bars Any Liability on the Defendants' Part for Any of the Torts Alleged by CRI.

As an additional reason for rejecting CRI's request for an adjudication that the defendants stood in a fiduciary relationship with CRI as a result of a joint venture, partnership or agency, defendants rely on the Texas independent injury rule. Defendants not only cite this rule defensively in their briefs which respond to plaintiff's motion, they also use this rule offensively in their own motion. Accordingly, the court discusses the independent injury rule in the portion of this order which addresses defendants' motion for partial summary judgment.  Suffice it to say here that for the reasons discussed later in this order, Texas' independent injury rule provides an additional reason why the portion of CRI's motion for summary judgment which pertains to CRI's tort claims should be denied.

### D.  CRI's Request for an Adjudication that the PXPL Defendants Had a Duty Under Tort Law to Disclose Material Facts and that Defendants Breached that Duty by Failing to Disclose and by Misrepresenting Material Facts Surrounding Defendants' Activities in the Breton Sound Area.

Lastly, CRI requests summary judgment from the court adjudicating that the PXPL defendants had a duty in tort to disclose material facts and that defendants breached this duty by concealing, by failing to disclose and by misrepresenting material facts surrounding the PXPL defendants' activities in the Breton Sound Area.

In this section of its brief, CRI basically makes two arguments.  The first is that CRI was entitled to the disclosures because of its relationship with 3TEC/PXPL. Setting aside the parties' contractual relationship,[22] absent an adjudication--which the court has now rejected--that CRI is entitled, as a matter of law, to some status which

_____

[22]As a part of count I, at trial, CRI may assert claims for breach of contract which survive this order, including any alleged breach of any agreement to disclose.  But in this portion of CRI's brief, CRI argues that a duty to disclose arises under tort law.

-36-

would give rise to a tort duty on defendants' part to disclose information to CRI (such as a fiduciary, joint venturer, partner, or principal with defendants as agent), there is no relationship upon which to now predicate any duty to disclose.  Moreover, in the portion of this order which considers the defendants' motion for partial summary judgment, the court expands upon these conclusions and determines that defendants are entitled to an adjudication that, as a matter of law, defendants were not fiduciaries, partners, joint venturers, or agents of CRI.  Based on those determinations, the court finds and concludes that, as a matter of law, there simply are no special relationships here which could give rise to any tort duty to disclose.

CRI's second argument in support of its position that it is entitled to summary judgment on its purported duty to disclose tort claim is that there were misrepresentations, false impressions, or partial disclosures by the defendants to CRI. There are no claims in this action which allege fraud or misrepresentation tort claims. Although the Amended Complaint includes many references to "secret" activities, secrecy is not necessarily improper and secrecy does not equal fraud.[23]  Moreover, fraud must be pled with particularity, and the court will not expand this action at this late date to include fraud claims which have never been alleged.

In short, apart from their contractual relationship, these parties were competitors and they were under no obligation to submit information, to give notice of their activities, or to disclose anything.  Accordingly, this aspect of CRI's motion for partial summary judgment should be denied.

---

[23]The word "fraud" does not appear in the Amended Complaint.

V.  The PXPL Defendants' Motion for Partial Summary Judgment.

The PXPL defendants also seek partial summary judgment, asking the court to adjudicate four particular issues in their favor.  As described in their moving brief (at p. 1), defendants ask the court to adjudicate as follows:

--That under the parties' agreement, CRI has the right to acquire only an undivided 5% of 8/8ths working interest in State of Louisiana Lease Nos. 17767, 17963, 17965 and 18340 (addressed in Part V. A., below);

--That CRI's breach of fiduciary duty claim be adjudicated in defendants' favor because, under controlling Texas law, (a) no fiduciary relationship exists or existed between CRI and the PXPL defendants or their predecessor 3TEC, and (b) CRI's breach of fiduciary duty claim is barred by the independent injury rule (Part V., B. and D.);

--That CRI's breach of the duty of good faith and fair dealing claim be adjudicated in defendants' favor because, under controlling Texas law, (a) the claim is barred by the independent injury rule, and (b) no special relationship, which is a requisite of a breach of duty of good faith and fair dealing claim, exists or existed between CRI and the PXPL defendants or their predecessors 3TEC (Part V., C. and D.); and

--That CRI's conversion claim be adjudicated in defendants' favor because, under controlling Texas law, the claim is barred by the independent injury rule (Part V. D.).

A.  Defendants' Request for an Adjudication that CRI has the Right to
Acquire Only an Undivided 5% of 8/8ths Working Interest in
SL Nos. 17767, 17963, 17965 and 18340.

Defendants' request for an adjudication that CRI has the right to acquire only an undivided 5% of an 8/8ths working interest in SL nos. 17767, 17963, 17965 and

18340, presents defendants' side of the 5% or 10% issue which this order has already addressed in the context of plaintiff's motion. The court has previously stated its conclusions that the parties' written agreements are unambiguous with respect to this issue and that the plain meaning of these agreements is that CRI was entitled to acquire a 10% interest in the PXPL defendant's 50% working interest in the above-described leases, meaning that CRI was entitled to be offered a 5% of 8/8ths working interest in these leases which included the Aquarius Well. Therefore, for reasons set out earlier in this order, the court now concludes that the PXPL defendants are entitled to summary judgment in their favor on this contract construction issue.[24]

## B. Defendants' Request for an Adjudication in Their Favor on CRI's Breach of Fiduciary Duty Claim.

The first reason which defendants advance in support of their request for an adjudication in their favor on CRI's breach of fiduciary duty claim is that no fiduciary duty or relationship exists here as a matter of law. In its consideration of CRI's motion, the court has already found that CRI did not carry its burden to show that it was entitled to an adjudication as a matter of law that defendants were its fiduciaries. That conclusion does not necessarily require the conclusion that defendants are entitled to a summary adjudication that there was no fiduciary relationship as a matter

---

[24]CRI's brief in response to defendants' moving brief on this point, at pp. 15-20, makes an argument on the 5% or 10% issue which is not a contract construction argument. CRI states: "In a case where the parties had not created conflicting obligations and the only interest available was less than a 100% interest, [defendants'] analysis might have some merit. However, that is not what occurred in this case." (Plaintiff's response brief, p. 16.) CRI then argues that defendants should not benefit from their breaches, which would be the result if they owe CRI only a 5% interest rather than a 10% interest. This argument asks the court to hold that the parties' written agreements have one meaning when certain historical facts have occurred and another when other historical facts have occurred, a notion which is at odds with the fundamentals of contract law and an argument which the court rejects, in any event, because it is at odds with the contracts' plain meaning. Thus, the court rejects CRI's argument to the extent that it is offered to show, as it is in CRI's brief, that "CRI Contracted For An Undivided 10% Interest in the Breton Sound AMI." (Title of plaintiff's response brief, Part IV, A., emphasis added, at p. 10, under which this argument appears.)

of law, but neither does it foreclose such a conclusion.  The existence of a fiduciary duty may be a fact question for the jury, but if defendants present evidence that there is no fiduciary duty as a matter of law and plaintiff does not respond with specific facts demonstrating that there is a genuine issue of material fact for trial on this issue, then this issue becomes one for the court.  Norman v. Apache Corporation, 19 F.3d at 1023.

The PXP defendants rely on the parties' written agreements as foreclosing a fiduciary relationship.  (See defendants' moving brief, pp. 16-21).  In response, CRI also relies almost exclusively upon the parties' written agreements.[25]  (See CRI's brief in response to defendants' moving brief, pp. 21-24, and CRI's moving brief at pp. 20-30, incorporated by reference in CRI's response brief.)  Furthermore, in their separate moving briefs, both sides urge the court to determine the question of whether or not a fiduciary relationship existed as a matter of law, based on the parties' relationship as expressed in the written agreements.[26]  In these circumstances, the court finds that the contract language controls, and that the same provisions in the parties' written agreements which support the court's earlier determination that CRI is not entitled to summary judgment declaring that a fiduciary duty existed between CRI and the PXP defendants, also support the conclusion, which the court states now, that, as a matter

_____

[25]In addition to its contract construction arguments, CRI argues that PXP has recently acknowledge shared control, in correspondence submitted with CRI's response brief as Exhibits 8, 9, and 10.  These exhibits are immaterial. They are also unauthenticated.  They are also, to some extent, inadmissable hearsay.  CRI's only other arguments which are not contractually based are its contentions that the parties referred to each other as "partners."  These contentions are disputed and, as stated elsewhere in this order, even if proven, would not be of sufficient weight, as a matter of Texas law, to override the contractual provisions, in the undisputed circumstances of this case.

[26]In its brief filed in response to the defendants' moving brief, however, CRI takes the position that to the extent *defendants* seek judgment as a matter of law regarding the non-existence of these relationships, there are fact questions which should be resolved by a jury.  (Plaintiff's response brief, p. 21.)

of law, the parties' written agreements create no fiduciary relationship and there is, in fact, no fiduciary duty between these parties with respect to any issues material to this action.  Accordingly, the court finds and concludes that the PXP defendants are entitled to summary judgment in their favor on CRI's claim for breach of fiduciary duty.

The second reason which defendants advance in support of summary judgment in their favor on this issue is the independent injury rule.  As defendants argue that the independent injury rule entitles them to judgment not only on CRI's breach of fiduciary duty claim but on all of CRI's tort claims, the court leaves discussion of the independent injury rule to section V. D. of this order, below.

C.  Defendants' Request for an Adjudication in their Favor on CRI's
Breach of the Duty of Good Faith and Fair Dealing Claim.

The first argument defendants make in support of their entitlement to an adjudication in their favor on CRI's claim for breach of the duty of good faith and fair dealing is the independent injury rule.  Discussion of this argument is deferred to section D., below.  The second ground which defendants put forward in support of their position is that there is no special relationship between the parties, which is required in a breach of duty of good faith and fair dealing claim.

Whether a legal duty exists between the parties is a question of law for the court unless the question requires the resolution of disputed facts or inferences which are inappropriate for legal resolution.  Humble Sand & Gravel, Inc. v. Gomez, 146 S.W.3d 170, 182 at n.22).  Texas rejects the notion that in every contract there is an implied covenant of good faith and fair dealing.  English v. Fischer, 660 S.W.2d 521, 522 (Tex. 1983).  For example, in Texas, there is no general duty of good faith and fair dealing in an ordinary, arms-length commercial transaction.  Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc., 960 S.W.2d 41, 51-52 (Tex.

1998).  Texas courts have consistently held that a duty of good faith is not imposed in every contract but only in special relationships marked by shared trust or an imbalance in bargaining power.  <u>Federal Deposit Ins. Corp. v. Coleman</u>, 795 S.W.2d 706, 708-09 (Tex. 1990).  Absent a special relationship, the duty to act in good faith is contractual in nature and its breach does not amount to an independent tort.  <u>Cole v. Hall</u>, 864 S.W.2d 563, 567-68 (Tex. App.-Dallas, 1993).  Defendants cite these principles and argue that under them, Texas courts refuse to impose a duty of good faith and fair dealing between the parties to a joint operating agreement.  *See*, <u>Taylor v. GWR Operating Company</u>, 820 S.W.2d 908, 912 (Civ. App.-Houston, 1991, writ denied) (no separate cause of action apart from contract action recognized based on a duty of good faith between the operator and the non-operator, where contract gave the right to audit, because any dispute regarding overcharging could be resolved under the terms of the contract).

CRI's response to defendants' arguments is consistent with these principles.  CRI argues that because "the parties' relationship was one of joint venture/partnership/agency and, as such, was a fiduciary relationship under Texas law," the special relationship which must underlie this tort has been established here.  (CRI's response brief to defendants' moving brief, p. 36.)  However, this order has now found that defendants did not owe CRI a fiduciary duty as a matter of law.  This order also has rejected CRI's view that it is entitled to summary judgment declaring that CRI is a joint venturer with defendants, that CRI is a partner with the defendants, or that the defendants are the agents of CRI.  Based on its findings and analysis to this point, the court now states its further findings and conclusions that the undisputed evidence conclusively establishes that CRI and the defendants were not joint venturers, were not partners, and that defendants were not the agents of CRI for any purposes material to this action.

-42-

Having found that the parties do not have any of these special relationships as a matter of law, and recognizing that Texas law requires such a special relationship in order to imply any duty of good faith and fair dealing between contracting parties, it follows that defendants are entitled to summary judgment on CRI's breach of good faith and fair dealing claim.

### D.   The Independent Injury Rule as Applied to CRI's Tort Claims Including its Conversion Claim.

Defendants argue that the Texas independent injury rule entitles defendants to summary judgment with respect to all three of the torts which CRI has alleged in this action--breach of fiduciary duty, breach of the obligation to perform the parties' agreements in good faith and with fair dealing, and conversion.

The independent injury rule recognizes that contractual relationships between parties sometimes create duties under both tort and contract law.  Exxon Mobil Corp. v. Kinder Morgan Operating L.P., 192 S.W.3d 120, 126 (Tex. App.-Houston, 2006, no pet.).  In Exxon Mobil, the court held that under the rule, if the defendants' conduct would give rise to liability independent of the fact that a contract exists between the parties, then the plaintiff's claim may sound in both tort and contract.   Id. at 126-27. In an elaboration that may be helpful even if it stops just shy of being completely tautological, the court explained that "if the defendants' conduct would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract." Id. at 127, citing Southwestern Bell Tel. Co. v. DeLanney, 809 S.W.2d 493, 494 (Tex. 1991).

The Texas Supreme Court elaborated on the rule in Southwestern Bell, stating as follows.  "In determining whether the plaintiff may recover on a tort theory, it is also instructive to examine the nature of the plaintiff's loss.  When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on

the contract."  As explained in <u>Jim Walter Homes, Inc. v. Reed</u>, 711 S.W.2d 617, 618 (Tex. 1986), "When the injury is only the economic loss to the subject matter of the contract itself, the action sounds in contract alone."  Finally, as stated in <u>DeWitt County Electric Coop., Inc. v. Parks</u>, 1 S.W.3d 96, 105 (Tex. 1999), when a contract spells out the parties' respective rights and duties, the contract, and not common law negligence, governs.

The Amended Complaint makes it clear that CRI's tort claims arise from and depend upon the written agreements between the parties.  For example, the "Facts" portion of the Amended Complaint, which is incorporated by reference in each of the counts, begins with and refers repeatedly to the joint exploration agreement, the joint operating agreements, and the parties' rights and obligations with respect to the areas of mutual interest as set out in those agreements.

Count II, CRI's breach of fiduciary duty claim, begins as follows.

> <u>By virtue of the terms and conditions of the Agreement and amendments to that Agreement</u> and the relationship of the parties, PXPL and PGC, as successors-in-interest to 3TEC, had control over the acquisition of leases and drilling of wells and owe Continental a fiduciary duty to act faithfully and with trust to promptly advise Continental of their acquisitions to give Continental the right to acquire its proportionate interest in such acquired property by sharing in the actual acquisition costs for the acquired interests.  PXPL and PGC also owe Continental the fiduciary duty to act in good faith to promptly submit to Continental copies of all instruments of acquisition including, but not limited to, copies of leases, assignments, farmouts and other contracts affecting the acquired interests, and also providing an itemized statement of actual costs and expenses incurred by PXPL and PGC in such acquisition.

(Amended Complaint, ¶19.  Emphasis added.)  The first sentence expressly states that the breach of fiduciary duty claim is "[b]y virtue of the terms and conditions of the Agreement...."  The second sentence is likewise dependent upon the parties' contracts, as it tracks the  provisions of Art. XV.H. of the joint operating agreements.  Count II

-44-

does not identify any damages different from any of the breach contract damages alleged in count I.

The tort claim for breach of the asserted duty of good faith and fair dealing, as alleged in count III, is also stated in a manner which makes clear that this tort arises from and depends upon the parties' written agreements. Indeed, as the duty of good faith and fair dealing is implied from the parties' written agreements, it could not be otherwise. For example, paragraph 23 of the Amended Complaint alleges that the defendants "owed a duty to Continental to perform their obligations <u>under the Agreement</u> in good faith and to deal fairly with Continental." Paragraph 24 alleges that the defendants "<u>were required to perform the Agreement, as amended, with care</u>" and that they "have <u>failed to perform duties inherent in the relationship created by the contract</u>." Paragraph 25 alleges that "<u>instead of performing their Agreement</u>, as amended," the defendants "<u>chose to ...breach the Agreement</u> by secretly acquiring leases and drilling wells without notification to Continental...and without offering Continental the right to participate...." (Emphasis added in all quotes.)

Count III also alleges CRI's conversion claim. Paragraph 25 alleges that defendants "have further converted identifiable proceeds of Continental through the acquisition of leases and drilling of wells and collecting proceeds from the sale of oil and/or gas from those wells, a portion of which belongs to Continental." This language refers to the defendants' obligations under the parties' written agreements. Although paragraph 26 alleges simply that "PXPL and/or PGC have instead used Continental's property for their own use," this allegation also implicitly depends upon the parties' written agreements as, without those, defendants' conduct would be "instead" of nothing. Paragraphs 27-30 do not expressly reference the parties' agreements, but they are merely conclusory allegations that the defendants "acted in bad faith," and that their conduct "is tortious," is "[m]alicious and intentional and/or

in reckless disregard for the rights of others," and that it is conduct which constitutes "tortious activities."

In defending its view that the independent injury rule does not bar its tort claims, CRI cites several cases.   Formosa Plastics Corp., 960 S.W.2d at 45-46 allowed a tort claim for fraudulent inducement to survive the independent injury rule, but there is no fraudulent inducement claim in this action and Formosa has been interpreted narrowly.  As stated by the Texas Supreme Court in DeWitt County Elec. Co-op, 1 S.W.3d at 104-06, "[o]ur unremarkable holding in Formosa was that a contract may be induced by fraud when a party promises to perform the contract while knowing that it has no intention of carrying out that promise."  DeWitt at 105.

CRI also relies on Cass v. Stephens, 156 S.W.3d 38 (Tex. App.-El Paso, 2004). That decision allowed a jury finding on fraud and conversion claims to stand as sufficiently independent of the breach of contract claims.  The court's reason for doing so was that plaintiff had "carefully delineated between the acts that were alleged to be breaches of contract, fraud, and conversion." *Id*. at 68.  The court stated that plaintiff "designated the numerous categories of overcharges and the charges for expenses not authorized by the JOAs as breach of contract injuries." *Id*.  "She designated the charges for expenses related to the Cass companion wells and the charges for property already owned by the joint owners as fraud injuries." *Id*.  "She designated the removal of jointly-owned equipment to the Cass companion wells as conversion injuries." *Id.*

By contrast here, the Amended Complaint does not delineate the damages arising separately from CRI's contract claims and tort claims.  Indeed, as alleged, the Amended Complaint makes clear that both sets of claims arise from the parties' contracts.  Even if the court were to look beyond the pleadings and evaluate the claims based upon CRI's explanation of them in its briefing, CRI has not responded to defendants' motion with any statement as to how CRI's tort claims or damages might

be distinct from its contract claims or damages.[27]   It appears that CRI has not responded with this type of delineation because the contract claims and the tort claims and their respective damages claims cannot be delineated or distinguished in this manner.

CRI further argues that its conversion claim, specifically, is not barred by the independent injury rule, citing <u>Cass</u>.  In <u>Cass</u>, the conversion claim was allowed because it was based on the claim that the defendant had unlawfully appropriated jointly-owned equipment for the use and benefit of defendant's solely owned wells, which the court stated "breached an obligation that exists independent of the JOAs." <u>Cass</u>, 156 S.W. 3d at 69.  "As a consequence," the court stated, "we conclude that [the defendants] breached a duty imposed by law."   *Id*.  The court  reasoned that the unauthorized appropriation of the jointly-owned equipment was similar to theft, and that the duty not to make unauthorized appropriations of equipment existed outside the contract.  *Id*.

Here, the conversion which allegedly occurred was a conversion which only exists by virtue of the contract.  This point is made by CRI's own response brief (at p. 33), where CRI itemizes the purported ways in which "CRI's conversion claim is separate and apart from its breach of contract claim."  The list includes the following: defendants' convincing CRI to release  its interests in the lands where the Aquarius Well lies; defendants' secret agreement to reacquire those lands with Century through a straw broker so its actions would be undetected; inquiring in early 2003 about opportunities to acquire additional properties with similar characteristics; engaging in secret negotiations with Century to acquire the Aquarius Lease; acquiring the Aquarius Lease with Century; drilling and marketing and selling oil and gas belonging

---

[27]By way of example only, CRI has not asserted that the contracts involved in this case were entered into by the defendants only as components of an overarching scheme to defraud.

to CRI; failing to market CRI's hydrocarbons and pay CRI as required by the contract; marketing the hydrocarbons for its own benefit and keeping the proceeds; continuing to ask the defendants about other opportunities in the areas of mutual interest and continually putting off CRI by claiming that the defendants needed to reprocess seismic information; and converting CRI's property by obtaining protection acreage to the Zeus and Aquarius Wells with Century, not CRI, even though Century had no interest in the Zeus Well.  The point is this:  absent the parties' rights and obligations as set out in their written agreements, none of these activities are challengeable.[28]

CRI's brief goes on in like manner, describing conduct by the defendants which it claims constitutes conversion and stating that this conduct, including the defendants' position that CRI is entitled to a 5% working interest and not a 10% working interest in the Aquarius Well, are topics which "are not covered by CRI's contract" and that CRI has suffered injuries "which go beyond the subject matter of the contract." (Plaintiff's brief filed in response to defendants' moving brief, p. 35.)  The court disagrees.  Unlike the facts in Cass, here, absent the parties' relationship as stated in and created by the written agreements, there is no separately arising duty with respect to the properties or proceeds in question, no separate claim for conversion or theft, and no separate injury as a result of the alleged conversion or any other alleged tort.

The court finds and concludes that the Texas independent injury rule precludes each of the tort claims alleged in this action.  That rule and its purpose fit this case exactly.  Absent the written agreements, these parties are competitors and even if all of the complained of conduct were proven, there is  no tort and no tort injury separate

---

[28]The only other alleged activity by the defendants which CRI complains about in this paragraph of CRI's brief is that "PXP misrepresented information to CRI and told CRI there were no other opportunities to acquire lands within the parties' venture."  (Plaintiff's response brief to defendants' moving brief, p. 33-34.)  As stated several times in this order, however, there are no fraud or misrepresentation tort claims in this action.

and distinct from the injury arising from the alleged breach of the parties' written agreements.  Therefore, in addition to the reasons already stated for adjudicating CRI's tort claims for breach of fiduciary duty and breach of the implied duty of good faith and fair dealing in defendants' favor, the court now makes the alternative finding and conclusion that defendants are also entitled to summary judgment on these tort claims because these claims are barred as a matter of law by the Texas independent injury rule.  The Texas independent injury rule equally bars CRI's conversion claim.[29]

### E.  Duty to Disclose Claim.

Finally, CRI's response brief makes the (somewhat mysterious) statement that "Defendants only moved for partial summary judgment and did not challenge CRI's claim for breach of the duty to disclose under the independent injury rule." (Plaintiff's brief in response brief to defendants' moving brief, at p. 35.)  CRI then states that "The reason [for this failure] is "clear," in that "Formosa Plastics and its progeny plainly provide that the independent injury rule does not apply to fraud claims."  (Plaintiff's brief in response to defendants' moving brief, p. 35.)

If, by these statements, CRI intends to characterize any claim in this lawsuit as a fraud claim, then the court disagrees with that characterization.  As the court has previously stated, there are no fraud, deceit, or misrepresentation-type tort claims alleged in this action.  Separate and apart from CRI's clearly labeled claims for breach of contract, breach of fiduciary duty, breach of the implied duty of good faith and fair dealing, conversion, or its claim for an accounting, there is no duty to disclose tort claim alleged here.  (The only duty to disclose issues which could conceivably remain

---

[29]As to that claim, the rule does not provide an alternative ground for summary judgment, however, as no other grounds for summary judgment were offered.

in this action after this order are any disclosure issues possibly encompassed by these two surviving claims.)

## VI.  Rulings.

After careful consideration of the parties' submissions, the record, and the pleadings, the parties' cross-motions for partial summary judgment are determined as stated below.  In every instance that summary judgment is granted, the court finds and concludes that there are no genuinely disputed issues of material fact for trial, after taking any disputed facts and inferences in the favor of the party opposing the motion with respect to that particular claim or issue.

### A.  Plaintiff's Motion for Partial Summary Judgment.

Plaintiff CRI's motion for partial summary judgment (doc. no. 79) is **GRANTED** in part and **DENIED** in part, as follows.

CRI's request for an adjudication as a matter of law that the PXP defendants, as successors of 3TEC by merger, have liability for any pre-merger misconduct by 3TEC, is **GRANTED**.  Summary judgment is entered in CRI's favor on that issue.

CRI's request for an adjudication as a matter of law that the PXP defendants breached their written agreements with CRI, specifically, the Breton Sound Area joint exploration agreement and the Olympus Project and Beta Prospect operating agreements, is **GRANTED** in certain respects and **DENIED** in certain respects, as follows.

CRI's request for an adjudication that the PXP defendants breached the joint exploration agreement by failing to offer CRI the opportunity to participate in the PXP defendants' 50% working interest in Louisiana State Lease no. 17767, which includes the Aquarius Well, and in SL nos. 17963, 17965 and 18340, is **GRANTED**.

CRI's request for an adjudication that under the parties' written agreements CRI is entitled to a 10% of 8/8ths working interest in the Aquarius Well is **DENIED**.

CRI's request for an adjudication that the PXP defendants breached the joint exploration agreement by originally refusing to pay CRI its share of natural gas, oil and condensate produced from the Aquarius Well is **GRANTED**.

CRI's request for an adjudication that the PXP defendants breached the joint exploration agreement and joint operating agreements by refusing CRI seismic information and by refusing CRI other rights is **GRANTED**.

In all other respects, CRI's motion for partial summary judgment is **DENIED**. Specifically, the court rejects CRI's request for an adjudication that the PXP defendants owed CRI fiduciary duties and that the defendants breached those duties. The court also rejects CRI's request for an adjudication that CRI and the PXP defendants were joint venturers or partners, or that the PXP defendants were CRI's agent for any purposes material to this action.  Finally, the court rejects CRI's request for an adjudication that defendants had a duty under tort law to disclose material facts and that they breached that duty by failing to disclose and by misrepresenting material facts surrounding defendants' activities in the Breton Sound Area.

B.  <u>Defendants' Motion for Partial Summary Judgment</u>.

The PXP defendants' motion for partial summary judgment (doc. no. 77) is **GRANTED** in all respects.

Specifically, the court hereby adjudicates as a matter of law that, under the plain language of the parties' agreement, CRI has the right to acquire only an undivided 5%

of 8/8ths working interest in State of Louisiana Lease no. 17767, which includes the Aquarius Well, and in SL nos. 17963, 17965 and 18340.

The court hereby adjudicates as a matter of law that no fiduciary relationship exists or existed between CRI and the PXP defendants or their predecessor 3TEC, and that CRI's breach of fiduciary duty claim is also barred by the independent injury rule. Either one of these grounds, standing alone, is sufficient to support this adjudication in defendants' favor.  Accordingly, summary judgment in defendants' favor is **GRANTED** on count II.

The court hereby adjudicates as a matter of law that the PXP defendants are entitled to summary judgment in their favor on CRI's breach of the duty of good faith and fair dealing claim because no special relationship exists or existed between CRI and the PXP defendants or their predecessors 3TEC, and because CRI's breach of the duty of good faith and fair dealing claim is also barred by the independent injury rule. Either one of these grounds, standing alone, is sufficient to support this adjudication in defendants' favor.  Accordingly, the court grants summary judgment to the PXP defendants on CRI's breach of the implied duty of good faith and fair dealing claim alleged in count III.

The court hereby adjudicates that the PXP defendants are entitled to summary judgment in their favor on CRI's conversion claim because that claim is barred by the independent injury rule.  Accordingly, defendants are entitled to judgment on that claim, also alleged in count III.

As the court has now adjudicated that defendants are entitled to judgment as a matter of law on the only claims alleged in count III, summary judgment in defendants' favor is **GRANTED** on count III.

C.  Claims and Issues Remaining for Trial

After the above rulings, the claims and issues which survive this order and remain for trial are as follows.

With respect to CRI's breach of contract claims (count I), to the extent this order finds in favor of CRI with respect to particular breaches of the parties' written agreements, damages remain to be tried with respect to each of these particular breaches.

CRI's claim for an accounting, alleged in count IV, was not challenged by defendants in their motion.  Accordingly, count IV also survives this order and remains for trial.

With regard to the PXP defendants' "Counterclaim for Declaratory Judgment," the court believes that this order adjudicates all of defendants' substantive requests for declaratory relief in defendants' favor.  If any of defendants' requests for declaratory relief (other than defendants' claims for costs and fees) are not effectively determined by this order, defendants are **DIRECTED** to advise the court in a short notice which briefly identifies any remaining counterclaim issues.  Any such notice shall be filed within five business days of the date of this order.

Dated this 5th day of October, 2006.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

04-1681p023(pub).wpd